UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

WRIGHT ASSOCIATES LLC, et al.,

                          Plaintiff,                    1:19-CV-459-WMS-MJR

                                                        REPORT AND RECOMMENDATION

          -v-


COPART OF CONNECTICUT, INC.,

                          Defendants.
_____

COPART OF CONNECTICUT, INC.,

                          Third Party Plaintiff,

          -v-


VILLAGE OF LEROY, NEW YORK and
TOWN OF LEROY, NEW YORK,

                          Third Party Defendants.
_____


## <u>INTRODUCTION</u>

        This case has been referred to the undersigned pursuant to Section 636(b)(1) of

Title 28 of the United States Code, by the Honorable William M. Skretny, to hear and

report on dispositive motions for consideration by the District Court. Before the Court is a

motion for summary judgment (Dkt. No. 70) brought by Defendant Copart of Connecticut,

Inc. pursuant to Rule 56 of the Federal Rules of Civil Procedure. Also before the Court is

a motion to amend (Dkt. No. 72) brought by Plaintiffs Wright Associates LLC, *et al*. For

the following reasons, it is recommended that Defendant's motion for summary judgment be granted and Plaintiff's motion to amend be denied.

**PROCEDURAL HISTORY[1]**

Plaintiffs Wright Associates LLC and Wright Wisner Distributing Corp., d/b/a Wright Beverage Distributing ("Plaintiffs" or "Wright") commenced this action on March 11, 2019 in New York State Supreme Court, Genesee County. (Dkt. No. 1-1). Plaintiffs allege that real property they own in LeRoy, New York has been damaged as a result of certain improvements made by Defendant Copart of Connecticut, Inc. ("Defendant" or "Copart") on an adjacent property. *Id*. Plaintiffs allege causes of action for trespass, nuisance, negligence, and injunction. *Id*.

Defendant Copart removed the action to District Court pursuant to 28 U.S.C. §§ 1332, 1441, and 1446 on April 15, 2019. (Dkt. No. 1). On May 2, 2019, Plaintiffs filed an amended complaint, which is now the operative pleading. (Dkt. No. 9). On June 3, 2019, Defendant filed an amended answer and counterclaim. (Dkt. No. 14). By its counterclaim, Defendant alleges that it has acquired a prescriptive easement to discharge stormwater onto a portion of Plaintiffs' property through an underground drainage pipe. (*Id*.).

On September 26, 2019, Defendant Copart filed a third-party complaint against the Village of LeRoy, New York and Town of LeRoy, New York ("Third-Party Defendants") seeking contribution, indemnification, and a declaration that the Third-Party Defendants are required to hold Copart harmless in accordance with a Memorandum of Understanding dated August 16, 2002 which concerned the proposed design and construction of a regional stormwater management facility to be located north of Copart's

---

[1] The Court assumes familiarity among the parties with the case and its procedural history. Therefore, only the relevant history is outlined here.

property. (Dkt. No. 28). The parties later filed a Partial Stipulation of Discontinuance agreeing to discontinue the third-party action against the Town of LeRoy only. (Dkt. No. 55).

On September 13, 2021, Defendant Copart brought a motion for summary judgment.[2] (Dkt. No. 70). Plaintiff Wright Associates filed a response in opposition. (Dkt. No. 79). Defendant filed a reply. (Dkt. No. 81). Third-Party Defendant Village of LeRoy filed a notice of its intent to join in Copart's motion for summary judgment. (Dkt. No. 75). In the event the summary judgment motion is granted, the Village requests the third-party action also be dismissed. (Dkt. No. 75).

On September 17, 2021, Plaintiff Wright moved to amend its complaint to add a cause of action for Defendant's violation of an approved site plan imposed by the Village of LeRoy.[3] (Dkt. No. 72). Defendant filed a response in opposition. (Dkt. Nos. 77, 78). Plaintiff filed a reply. (Dkt. No. 80).

This Court heard oral argument on each of the motions on November 17, 2021. The Court then allowed supplemental briefing on the issues. The parties submitted supplemental memoranda on December 13, 2021. (Dkt. Nos. 86; 87). At that time, the Court considered the matter submitted for report and recommendation.

---

[2] Based on agreement of the parties to bifurcate liability and damages determinations, the Court set a deadline for submission of dispositive motions on liability issues only. (Dkt. No. 68).

[3] Following a conference to address Plaintiff's intention to seek leave to amend, the Court directed that any motion to amend the pleadings would be made by the same deadline set for dispositive motions. (Dkt. No. 69).

## FACTS[4]

Wright Associates brings this action for trespass, nuisance, and negligence, and seeking an injunction, based on claims that Copart's development of a property adjacent to its own has caused a substantial increase in surface water to flow onto and damage Wright's property.

The relative location of the properties is depicted below. Wright's properties, located at 1 Wright Avenue and 3 Wright Avenue, are indicated by "1" and "3" markings. Copart's property, located at 4 West Avenue, is indicated by "4" marking.



(Dkt. No. 70-1, ¶ 7).

---

[4] The facts described herein are taken from the pleadings, motion papers, statement of undisputed facts, and exhibits filed in this lawsuit. When citing a proposed fact within Copart's statement of material facts, the Court has confirmed that opposing party's responding statement either admits the fact or fails to specifically controvert it with evidence. *See* W.D.N.Y. L.R. Civ. P. 56(a). When citing an exhibit attached to the statement of facts or opposing statement of facts, the Court has provided the CM/ECF docket number and page number(s).

_Wright Property_

The Wright property consists of two separate contiguous parcels of land – 3 Wright Avenue and 1 Wright Avenue – located in the Village of LeRoy in Genesee County, New York. (Dkt. No. 70-2, ¶ 7). The 3 Wright Avenue parcel was acquired by Wright Associates in 2004 and is improved with a large "slab-on-grade" foundation warehouse, originally constructed in 1967, and areas of paving. (_Id_., ¶ 8). The 1 Wright Avenue parcel was formerly owned by Buckingham Properties until a portion of it was leased by Wright Associates in 2016 and the entirety of the parcel purchased by Wright Associates in 2019. (_Id_., ¶ 9).

Prior to the lease and subsequent purchase, the portion of 1 Wright Avenue immediately north of 3 Wright Avenue was essentially undeveloped. (_Id_., ¶ 10). After acquiring it, Wright Associates expanded its parking lot at the north end of 3 Wright Avenue onto a portion of 1 Wright Avenue. (_Id_., ¶ 11). Large portions of 3 Wright Avenue and 1 Wright Avenue are comprised of impervious surfaces. (_Id_., ¶ 12). Stormwater is discharged from the Wright property through roof drains, sheet flow, and swales in a northerly direction into a drainage ditch located north of the property. (_Id_., ¶ 13). The drainage ditch is located on a property owned by a railroad and/or the Village of LeRoy, and from it, water flows through ditches to the east and south, ultimately discharging to Oatka Creek. (_Id_.). Stormwater on the Wright property flows off the property to the north and is uncontrolled, apart from stormwater collected along the western boundary of the property. (_Id_., ¶ 14).

Prior to Wright's acquisition and improvement of the 3 Wright Avenue property, an existing drainage swale channeled water to the west of the warehouse building in a

northerly direction across the 1 Wright Avenue property to the existing drainage swale to the north of 1 Wright Avenue ("Western Swale"). (*Id*., ¶ 15). Wright modified the existing Western Swale in 2010 by lining the existing channel with stone. (*Id*., ¶ 16). Wright replaced the Western Swale in 2018 by installing a 12-inch diameter pipe and a series of four receivers ("2018 Drainage System"). (*Id*.).

*Copart Property*

The Copart property is located at 4 West Avenue in the Village of LeRoy and is immediately west of and upgradient from the Wright property. (*Id*., ¶ 17). Copart acquired the property in 2002 for the purpose of developing an automobile auction facility. (*Id*., ¶ 18). At the time of purchase, the Copart property was improved with an approximately 12,000 square foot building and small parking lot. (*Id*., ¶ 19). The property had an approximately 92,000 cubic foot pond to the west of the building. (*Id*.). The remainder of the 37-acre property was generally flat and undeveloped pasture and grassland, sloping gently to the northeast, northwest, and southeast. (*Id*.).

Copart was granted a use permit for the proposed facility from the Village of LeRoy on July 8, 2002, and it received site plan approval on July 22, 2002. (*Id*., ¶ 20). Thereafter, Copart commenced construction of its facility, which consisted of enlarging the existing paved parking lot and constructing a gravel yard on the remainder of the unimproved area. (*Id*., ¶ 21). Copart's use of the property as an automobile auction facility is a permitted use under the Village Zoning Code. (*Id*., ¶ 20). Copart also obtained the necessary coverage under the then-applicable State Pollutant Discharge Elimination System general permit for stormwater discharges associated with construction activity. (*Id*., ¶ 22).

Due to pre-existing drainage problems in the general vicinity of the Copart property and the Wright property, the site plan approval was conditioned upon Copart, the Village of LeRoy, the Town of LeRoy, the County of Genesee, and the seller of the Copart property entering into an agreement to design and construct a regional wetland to accept drainage from the Copart property and other properties. (*Id*., ¶ 24). The proposed wetland facility was not designed specifically to accept drainage from the Copart property alone, but rather to improve poor drainage conditions in the "West Main Street area of the Village" which pre-dated the development of the Copart property. (*Id*., ¶ 31). The above-referenced parties subsequently entered into a Memorandum of Understanding ("MOU") that set forth the respective obligations of the parties to design and construct the proposed regional wetland facility. (*Id*., ¶ 25). Under the MOU, Copart was obligated to: (a) fund the design and survey work; (b) provide funding, in the form of a performance bond, for up to $50,000 towards construction of the proposed regional wetland facility; and (c) arrange for the relocation of certain off-site culverts. (*Id*., ¶ 26). The Village was obligated to, among other things: (a) apply for and obtain all necessary permits and approvals necessary for construction of the proposed regional wetland facility; and (b) construct the facility (with the assistance of the Town and County). (*Id*., ¶ 27). Copart provided a performance bond to the benefit of the Village of LeRoy in the amount of $50,000 on or about September 19, 2002. (*Id*., ¶ 28). Copart also obtained approval for the lowering of off-site culverts in January 2003. (*Id*., ¶ 29). Copart completed and delivered to the Village a fully engineered design for the proposed regional wetland facility to be located generally north and northwest of the Copart property. (*Id*., ¶ 30). However, the Village was not able

7

to obtain the necessary permits to construct the proposed regional wetland facility, and it never constructed such facility. (*Id.*, ¶ 32).

Because the proposed wetland facility was never constructed, Copart modified the drainage plan for the Copart property to manage stormwater on the eastern portion of its property.[5] (*Id.*, ¶ 33). Specifically, Copart installed two receivers in the northcentral and northeast portion of the Copart property, which were connected to each other by a pipe, and which discharge a portion of the stormwater from the property through a pipe ("Copart Outlet Pipe") that runs underground from the northeast receiver, under the Copart fence and terminates aboveground near the boundary with 1 Wright Avenue in the vicinity of the pre-existing Western Swale on the Wright property. (*Id.*). The catch basins and the Copart Outlet Pipe were installed in 2003. (*Id.*) These catch basins and an associated shallow swale running in a northerly direction near the eastern boundary of the Copart Property ("Copart Swale") collectively intercept a significant portion of surface runoff that would otherwise drain as sheet flow to the east and concentrate the majority of runoff from the Copart property to the northeast corner of the Copart property, which is then discharged through the Copart Outlet Pipe downgradient from the Wright warehouse. (*Id.*, ¶ 35). Video evidence filmed after rainfall shows a steady amount of water flowing through gravel or stones in the area of the Copart Outlet Pipe onto the northwest corner of the Wright property, then flowing into Wright's Western Swale and joining a drainage ditch running roughly eastward along the northern boundary of the Wright property. (Dkt. No. 70-36, WR000225-231.mp4, WR000236.mp4, WR000237.mp4, and WR000240.mp4).

---

[5] Wright submits that these deviations from the approved site plan were not made in good faith, were knowingly made by Copart in violation of the plan, and continue to be the cause of excess surface water runoff being cast onto the Wright property. (Dkt. No. 79, ¶ 33).

Despite Copart's drainage mechanisms, video evidence also shows that some surface water run-off from the Copart property moving in the form of sheet flow under Copart's perimeter fence onto the Wright property. (Dkt. No 79, ¶ 35; 70-36, WR000231.mp4 and WR000236.mp4).

The following figure depicts the location of the various components of the Copart drainage system:



**Figure 2.** Artificial Means Employed by Copart to direct water onto Wright Parcel

(Dkt No. 70-2, ¶ 39).

On March 4, 2003, the Village of LeRoy granted a "Certificate of Compliance/Occupancy" for the Copart property stating that the "office building and the yard areas immediately surrounding 4 West Avenue […] are in compliance with the rules and regulations of the Village of LeRoy." (*Id*., ¶ 36).

After Copart's yard was originally built, additional stone and gravel was brought in to maintain the condition of the yard. (Dkt. No. 79-1, Brunea Tr. 23:19-30:20). Copart's Yard Manager, Larry Brunea testified that Copart had received truckloads of gravel or stone at the rate of two 35-ton deliveries per month for the past two and half years. (*Id*.). He categorized these as "monthly maintenance loads." (*Id*.). He further explained that such loads are spread on the property and used to address "wear and tear on the yard from running heavy equipment, running loaders, indentations in ground," and that such stone is put place "[w]herever there's a low spot, wherever there's a hole." (Dkt. No. 81-2, Brunea Tr. at 27:8-12; 30:15-17).

*Allegations and Notice of Water Discharges*

Wright Associates allege that stormwater has discharged, and continues to discharge, from the Copart property to the Wright property in two distinct artificial means: (a) sheet drainage flowing from west to east, underneath Copart fence and down the embankment along the boundary between the two properties; and (b) through the Copart Outlet Pipe in the northeast corner of the Copart property (collecting water from the catch basins and Copart Swale) discharging to the northwest corner of the Wright property. (*Id*., ¶ 37). Wright identifies the sheet flow drainage as artificial means based on Copart's re-grading and laying down of gravel and rock over a larger than approved acreage, thereby creating an impervious surface that has increased the rate of runoff as compared to pre-development conditions. (*Id*., ¶ 38; Dkt. No. 79, ¶ 37). Wright identifies the pipe drainage as artificial means based on installation of the two catch basins in the north portion of the Copart property, the Copart Outlet Pipe, and the Copart Swale. (Dkt. No. 70-2, ¶ 39).

With respect to sheet flow drainage onto the Wright property south of, and upgradient from, the Copart Outlet Pipe, Wright was aware of such discharges as early as 2004, when it first acquired 3 Wright Avenue. (Dkt. No. 70-2, ¶ 43). The Phase I Environmental Site Assessment prepared for Wright documented the existence of standing water along the warehouse slope from the Copart property. (*Id*.). Wright's Operations Director/Property Manager, Dean Kendall, testified that Wright "first came to believe that surface water or stormwater draining from the Copart property was causing problems on the Wright property" in 2010 when Wright's warehouse flooded. (Dkt. No. 70-7, Kendall Tr. 38:16-39:16). In response to this flooding, Wright hired a contractor to install a French drain or swale on the west side of the building running north to its parking lot. (Dkt. No. 79-1, Kendall Tr. 43:10-23). Although Mr. Kendall later stated that Wright did not realize what was causing the water problem until 2016, when water coming over the bank from the Copart property was observed, (*Id*., Kendall Tr. 43:23-44:13), he also testified that in 2013 "you could physically see the water running down the hill from Copart and just a constant stream of water." (*Id*., Kendall Tr. 117:13-23).

Regarding pipe and channel drainage, Wright characterizes the Copart Swale as being newly created in 2018. (Dkt. No. 79, ¶ 40). Conversely, Copart submits that the evidence establishes that this swale was previously existing and merely cleaned out or restored in 2018. (Dkt. No. 70-2, ¶ 40). Wright relies on evidence of work done by Copart's contractor, TSP Corporation/Tom McGinnis Excavating & Plumbing, to support its claim that the swale was newly installed. (Dkt. No. 79, ¶ 40). A TSP Corporation letter dated August 7, 2018 provides a price estimate to "[d]ig out and create swail [sic] for excess water to drain north to catch basin." (Dkt. No. 79-1, pg. 4). Initially, Thomas Smith,

Property Manager for Copart, acknowledged in his deposition that TSP created a swale for excess water to drain north to a catch basin on the Copart property, which in turn directed water through a discharge pipe towards the Wright property. (*Id*., Smith Tr. 55:18-56:20). However, Mr. Smith clarified his testimony to state that he "understood [the Copart Swale] to be restoring a condition that existed for the last 16, 17 years." (Dkt. No. 79-1, Smith Tr. 57:1-2). Additionally, Copart's Yard Manager, Mr. Brunea, described this work as "clean[ing] out the swale" along the east boundary of the Copart property in response to complaints from Wright. (Dkt. No. 70-31, Brunea Tr. 99:25-97:12). Lastly, email correspondence from September 2018 between Wright and Copart employees supports Copart's contentions. (Dkt. No. 70-35). Therein, Copart employee Mike Cassata confirms Copart's agreement to "start restoring the swale" following discussions about water flow problems, and states that the work has since been completed. (*Id*.).

It is undisputed that the Copart Swale directs water to the northeast catch basin and the Copart Outlet Pipe, which has discharged water, since 2003, onto the 1 Wright Avenue parcel to the north of the 3 Wright Avenue parcel and the Wright warehouse. (Dkt. No. 70-2, ¶ 40). The Copart Outlet Pipe discharges onto the Wright property at a point downgradient of the Wright warehouse building. (Dkt. No. 70-2, ¶ 41). The water discharged through this pipe and in this vicinity flows to the north, away from the warehouse. (*Id*.). Nonetheless, Wright states that "excess surface water being directed from Copart and dumped onto Plaintiffs' Property causes a backing up of the water, not allowing it to flow along the west side and into the Plaintiffs' retention pond and causes it to back up against Plaintiffs' [warehouse] building on 3 Wright Avenue." (Dkt. No 79, ¶ 41). As evidence of this, Wright cites to deposition testimony of its Property Manager, Mr.

Kendall. (Dkt. No. 79-1, Kendall Tr. 81:2-20). Mr. Kendall stated that in 2016 they "realized [Copart's 'drain tile'] was backing up water, not allowing the water along the west side to flow, because it's at the end of the stream, more or less. So, the more water you're dumping at the end and into the retention pond, backs up the water against the building." *Id*.

Additionally, Copart maintains that the catch basins and Outlet Pipe have existed in open and notorious fashion since 2003. (Dkt. No. 70-2, ¶ 34). Wright disputes this and has submitted evidence that 8-foot solid fencing surrounds the perimeter of Copart's property, and that Wright did not know of the existence of the Copart Outlet Pipe on Wright's property until 2016. (Dkt. No. 79, ¶ 34). Mr. Kendall testified that Wright was not aware of water coming from the Outlet Pipe onto Wright's property until late 2016, at which time Mr. Brunea made them aware of it. (Dkt. No. 79, ¶ 43, Kendall Tr. 69:10-25). Mr. Kendall stated that, prior to 2016, the location of the termination of the outflow pipe was "just weeds." (*Id*., Kendall Tr. 80:10-14). The Copart Outlet Pipe was subsequently buried and eventually tied into the 2018 Drainage System by Wright Associates. (Dkt. No. 70-1, ¶ 34). Video evidence does not show any portion of a visible outlet pipe on Wright's property. (Dkt. No. 70-36, WR000225-231.mp4, WR000236.mp4, WR000237.mp4, and WR000240.mp4).

## **DISCUSSION**

### I.    *Rule 56 Standard*

Pursuant to Federal Rule of Civil Procedure 56, summary judgment is to be granted where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56. A genuine issue of

material fact exists "where the evidence is such that a reasonable jury could decide in the non-movant's favor." *Beyer v. Cty. of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008). "[V]iewing the evidence produced in the light most favorable to the nonmovant, if a rational trier [of fact] could not find for the nonmovant, then there is no genuine issue of material fact and entry of summary judgment is appropriate." *Bay v. Times Mirror Magazine, Inc*., 936 F.2d 112, 116 (2d Cir. 1991). When a movant has met this burden, the burden shifts to the non-movant to bring forth evidence establishing the existence of an issue of material fact. *Linares v. McLaughlin*, 423 Fed. Appx. 84, 86 (2d Cir. 2011).

In evaluating a motion for summary judgment, a court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party, and it is the burden of the moving party to demonstrate the absence of any material genuinely in dispute. *Hathaway v. Coughlin*, 841 F.2d 48, 50 (2d Cir. 1988). Importantly, a court must not "weigh the evidence, or assess the credibility of witnesses, or resolve issues of fact." *Victory v. Pataki*, 814 F.3d 47, 59 (2d Cir. 2016) (citation omitted). However, a party cannot defeat a motion for summary judgment by relying upon conclusory statements or mere allegations unsupported by facts. *Davis v. New York*, 316 F.3d 93, 100 (2d Cir. 2002). The nonmoving party "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co*., 654 F.3d 347, 358 (2d Cir. 2011).

II.    <u>Motion for Summary Judgment</u>

Copart brings a motion for summary judgment seeking dismissal of Wright's amended complaint and for judgment on its counterclaim to declare that Copart has acquired a prescriptive easement for the discharge of water onto Wright's property via its

drainage pipe. (Dkt. No. 70). Third-Party Defendant Village of Leroy joins in Copart's request for relief and adopts the positions contained in Copart's motion. (Dkt. No. 75). In the event summary judgment is granted, the Village of Leroy requests that the third-party complaint also be dismissed. The Court addresses each of Copart's arguments and Wright's opposition to them below.

1.  *Trespass, Nuisance, and Negligence Claims*

Copart first submits that it is entitled to summary judgment on Wright's trespass, nuisance, and negligence claims which are premised on sheet flow of water because a property owner is not liable for discharge of water onto an adjoining property when caused by improvements made in good faith and without the use of artificial means. (Dkt. No. 70-1, pgs. 14-19). The Court agrees.

A claim for trespass requires an affirmative act constituting or resulting in an intentional intrusion upon plaintiff's property. *Congregation B'Nia Jehuda v. Hiyee Realty Corp.*, 35 A.D.3d 311, 312 (1st Dep't 2006). Similarly, a claim for nuisance requires an intentional interference with the right to use and enjoy property. *Id.* The elements of a private nuisance claim are: "(1) an interference substantial in nature, (2) intentional in origin, (3) unreasonable in character, (4) with a person's property right to use and enjoy land, (5) caused by another's conduct in acting or failure to act." *Copart Industries, Inc. v. Consolidated Edison Co.*, 41 N.Y.2d 564, 570 (1977). Such a claim is actionable upon proof that a defendant's invasion was either intentional, negligent or reckless, or otherwise involved abnormally dangerous activities. *Wfe Ventures v. Gbd Lake Placid*, 197 A.D.3d 824, 831 (3d Dep't 2021). In this manner, "negligence is one of the types of conduct on which a nuisance may depend." *Copart*, 41 N.Y.2d at 572.

However, to establish liability for damages under theories of trespass, nuisance, or negligence based on the flow of surface water onto one's property, a plaintiff is required to demonstrate that a defendant diverted the surface water by artificial means or that the improvements were not made in a good faith effort to enhance the usefulness of the defendant's property. *See Prachel v. Town of Webster*, 96 A.D.3d 1365, 1365-66 (4th Dep't 2012). Indeed, it is well-settled under New York law that:

> Landowners making improvements to their land are not liable for damage caused by any resulting flow of surface water onto abutting property as long as the improvements are made in a good faith effort to enhance the usefulness of the property and no artificial means, such as pipes and drains, are used to divert the water thereon.

*Silverman v. Doell*, 138 A.D.3d 1339, 1340 (3d Dep't 2016) (citations omitted). "Thus, a plaintiff seeking to recover must establish that the improvements on the defendant's land caused the surface water to be diverted, that damages resulted and either that artificial means were used to effect the diversion or that the improvements were not made in a good faith effort to enhance the usefulness of the defendant's property." *Id*.

In *Kossoff v. Rathgeb-Walsh, Inc*., 3 N.Y.2d 583, 588 (1958), the New York Court of Appeals explained that either owner of adjacent upper and lower properties "can improve his land according to his desire in any manner to which the land is suited, without being liable to the abutting owner for change in the flowage of the surface water provided that he does not resort to drains, pipes or ditches." There, plaintiff owned a downgradient parcel of property which was allegedly damaged by water diverted from defendant's parcel after improvements to convert defendant's property into a gas service station. *Id*. at 586. Those improvements included construction of a garage and paving a large portion of the property which raised the property up approximately one foot and caused a

significant amount of surface water to be diverted to plaintiff's property. *Id*. The Court of Appeals affirmed dismissal of the complaint on the basis that "defendants had the right to make reasonable improvements to this parcel of land including incidental changes in grade, even though the effect was to increase and accelerate the flow of surface water upon plaintiff's land." *Id*. Indeed, courts uniformly deny claims of trespass, nuisance, and negligence where paving or other improvements, done in good faith and without use of artificial means, cause water runoff and damages. *See Smith v. Town of Long Lake*, 40 A.D.3d 1381, 1383 (3d Dep't 2007) ("paving alone… does not constitute artificial means of diversion"); *Rodriguez v. City of New York*, 94-CIV-5864, 1996 U.S. Dist. LEXIS 6128 (S.D.N.Y. May 8, 1996) (granting summary judgment and holding that upgradient owner and lessee of dirt and gravel parking lot could not be held liable for water flowing off of parking lot and flooding adjacent street); *Cottrell v. Hermon*, 170 A.D.2d 910 (3d Dep't 1991) (affirming summary judgment to defendant where water seepage was caused by defendant's installation of a concrete patio); *Langdon v. Town of Webster*, 238 A.D.2d 888 (4th Dep't 1997) (affirming summary judgment dismissing the complaint where plaintiff failed to raise a factual issue whether artificial means were used to effect a surface water diversion or whether defendants constructed the subdivision abutting plaintiff's property in good faith).

Here, Wright alleges that stormwater has discharged, and continues to discharge, in two ways: (1) sheet drainage flowing from the west to east underneath the Copart fence and down the embankment along the boundary between the two properties; and (2) through the Copart Outlet Pipe in the northeast corner of the Copart property (collecting

water from Copart's catch basins and swale) discharging to the northwest corner of the Wright property.

As a starting point, the sheet flow of water from the Copart property onto the Wright property occurs based on the gradient change and downslope between the two properties. Copart admits that it has paved and laid gravel over a substantial portion of its property, which has affected the movement of water when compared to the land's natural and unimproved state. Yet, the paving of the property suits Copart's use and development of the parcel as an automobile auction lot. This can be squarely characterized as a good faith effort to improve the usefulness of the property without the use of artificial means to divert water.

With regard to the sheet flow drainage, Wright argues that "artificial means" were used to divert that water. These means are identified as: (1) the re-grading the surface of the Copart parcel so that a larger than approved acreage drains east toward the Wright parcel, (2) the laying down of gravel and rock on a larger than approved acreage on the Copart property to create an impervious surface that has increased the rate of runoff, and (3) by creation of an additional drainage swale directing excess runoff to the Wright parcel.[6] (Dkt. No. 79, ¶ 37). Wright acknowledges the law of *Kossoff* but argues that the facts here show this is more than "diffuse" surface water being directed towards its property. Indeed, "[t]he diversion of water by artificial means [...] is not strictly limited to the use of pipes, drains and ditches and may otherwise be established where it is demonstrated that the net effect of defendants' improvements 'so changed, channeled or increased the flow of surface water onto [the] plaintiff[s]' land as to proximately cause

---

[6] Copart's use of the drainage swale and catch basins is addressed separately below.

damage[] to the property." *517 Union St. Assoc. LLC v. Town Homes of Union Sq., LLC*, 156 A.D.3d 1187, 1189 (3d Dep't 2017) (quoting *Long v. Sage Estate Homeowners Assn., Inc.*, 16 A.D.3d 963, 965 (2005)).[7] In *517 Union Street*, the Appellate Court reviewed competing expert testimony and concluded that there were "triable issues of fact as to whether defendants' improvements to their parcels diverted surface water onto plaintiffs' property by artificial means […], were made in bad faith or otherwise altered the elevation and grade of [defendants'] parcel with the express purpose of diverting water onto plaintiffs' property." 156 A.D.3d at 1191.

The Court finds the holdings of *517 Union Street* and *Long* inapplicable to these facts. Here, the record before the Court shows only that diffuse surface water from the Copart property flows down the western embankment of the Wright property following rainfall. The only evidence of channeling of water onto the Wright property is through the Copart Outlet Pipe in the northwest corner of the Wright parcel. Further, Wright has failed to provide any evidence to establish that Copart paved the lot or altered the elevation or grade of its parcel with the express purpose of diverting water onto Wright's property. In fact, the undisputed evidence shows that Copart's 2003 drainage plan and 2018 swale restoration had the purpose and effect of reducing the sheet flow or runoff of water between the two properties.

The Court also sees no evidence that Copart has acted in bad faith by developing its property in a manner not in compliance with the Village of LeRoy's approved site plan,

---

[7] It is noted that in *Long v. Sage Estate*, the Court stressed that actionable "artificial means" are not limited solely to pipes, drains, or ditches, but it did not extend that as far as simple paving. The Court held that defendant's construction of a berm, which diverted a large volume of water into a narrow swale, thereby creating a "funnel effect," onto plaintiff's property, did constitute "artificial means." 16 A.D.3d at 965.

or by misrepresenting the nature of its business. (Dkt. No. 79, ¶ 18). Wright maintains that Copart's intended use of the land was to operate a salvage or junk yard for receipt, storage, and disposal of "insurance wreck" vehicles from casualty insurance companies, contrary to the purpose represented to the Village of LeRoy Planning Board when Copart applied for site plan approval and use permits. (*Id.*). To the contrary, Copart has presented credible evidence, in the form of an affidavit of its General Manager, Jeffrey Burns, as well as business registration documents, which refute Wright's claims and demonstrate that the business is both classified and operating as an automobile auction facility, not a junkyard. (*See* Dkt. No. 81-1). Despite Copart's submission of evidence to support its planned use, Wright bases its position solely on the deposition testimony of Mr. Brunea, Yard Manager for the Copart facility. Yet, Mr. Brunea clearly testified that the facility is used as an "auto auction operation." (Dkt. No. 79-1, pg. 155, Brunea Tr. 11:6). At no point did Mr. Brunea state that Copart dismantled or disposed of vehicles, in the manner of a junkyard. Yet, Wright places much importance on Mr. Brunea's admission that Copart has "standing agreements with certain insurance companies to handle their insurance wrecks." (*Id.*, Brunea Tr. 18:17-19). The Court rejects Wright's contention that this testimony creates a triable issue of fact regarding bad faith conduct, as there is ample evidence to establish Copart's planned and ongoing use of the property as an automobile auction facility and Mr. Brunea's testimony regarding the company's receipt or storage of certain types of vehicles does not contradict that use.

Wright's claim of bad faith derived from Copart's deviation from the approved site plan is also contradicted by evidence. It is clear that Copart attempted to comply with the site plan but reached an impasse when the Village of LeRoy could not obtain the

necessary permits to construct the proposed regional wetland. Copart has shown that it fulfilled its obligations under the MOU and plan, including completing an engineered design and providing a performance bond. Because the wetland facility was not constructed, Copart modified its drainage plan by installing catch basins and a drainage pipe in 2003. This modified plan and Copart's receipt of a Certificate of Compliance/Occupancy from the Village of LeRoy in 2003 further evidence a lack of bad faith in developing the property.

Wright has not presented evidence that Copart employed artificial means to divert runoff water across the western boundary, nor that Copart's improvements were not made in good faith to enhance the usefulness of its property. Thus, the effect of Copart's improvement of the land on sheet flow of water onto Wright's property is not actionable under New York law.

However, Wright has not only alleged damage from sheet flow drainage, it has also claimed damage from stormwater water travelling through Copart's catch basins and swale which is discharged through the Outlet Pipe onto the northwest corner of the Wright property. Such use of pipes, catch basins, and swales clearly constitute "artificial means" of diversion, which are generally actionable.

The outflow pipe, catch basins, and swales which comprise Copart's drainage system all direct water to the northeast corner of Wright's property, which the undisputed facts show is significantly downgradient from the southwest-situated warehouse that Wright alleges has been damaged by stormwater discharges. Copart has offered credible evidence that these channeled water discharges occur exclusively on the lower northern end of Wright's property. Thus, Copart contends that the damage to Wright's warehouse

could not have been caused by the drainage of water onto the lower portion of land. Indeed, it is common sense that water does not flow uphill.

However, Wright argues that water from Copart's drainage system flows into a retention pond on the Wright property that has backed up so much that water rose uphill to the warehouse. Wright supports this claim with testimony of its Property Manager, Mr. Kendall, who stated, "so, the more water you're dumping at the end and into the retention pond, backs up the water against the building." (Dkt. No. 79-1, Kendall Tr. 81:4-11). Wright's expert has not specifically opined that water from a retention pond has backed up from the north to reach the warehouse building, but he states generally that runoff from the Copart property has caused "significant flooding" on the Wright property. (*See* Dkt. Nos. 79-1, 79-2, Newcomb Report and Surrebuttal).[8] In this regard, Mr. Newcomb's report does not contradict the claim made by Mr. Kendall. Although Wright's evidence appears slim, and, notably, there is no photographic or video evidence in the record to further support this allegation, Wright has met its burden to provide specific evidence showing the existence of a genuine dispute of material fact. Further, Wright may be able to prove damage to the undeveloped northern side of its property where the objectionable water is channeled, separate and apart from the alleged warehouse damages.[9]

---

[8] Wright's expert report identifies the sources of water runoff from the Copart property as including installation of catch basins and underground piping, and he summarizes the alleged water discharge damages as follows: "The runoff caused significant flooding on the Wright Parcel during rain events adjacent to, against, and under the western wall of Wright's building. The runoff degraded the wall of the Wright building, infiltrated into the Wright building work space, and is the likely cause of the voids identified beneath the building's slab." (Dkt. No. 79-1, pg. 56).

[9] For example, Wright claims that it incurred costs in 2016 related to maintaining the flow of water off the northern end of its property, along the railroad tracks. (*See* Dkt. No. 79-3, pg. 15) (asserting that Wright "engaged contractors to reditch the approximately 500 feet along the railroad tracks on the northern boundary of Plaintiff's property to install an additional 75 feet of French drain to divert storm water from the west side of Plaintiff's property.")

In sum, the Court finds that Wright's claims of sheet flow or surface runoff water are nonactionable as they result from paving or other development of Copart's property, and such improvements were not made in bad faith. The Court further finds that Copart has used artificial means to divert or channel water onto a portion of the Wright property, i.e., by the use of swales, catch basins, and pipes, and that Wright has raised triable issues of fact as to whether its property has been damaged as a result of such artificial diversion.

   2.   *Statute of Limitations*

Despite the conclusion that triable issues of fact exist as to some of Wright's claims, the Court finds that Wright's trespass, nuisance, and negligence claims are time-barred under the applicable 3-year statute of limitations.

An action to recover damages to property must be commenced within three years of the date of the injury. NY CLS CPLR § 214(4). The cause of action accrues when the damage is apparent. *Russell v. Dunbar*, 40 A.D.3d 952, 953 (2d Dep't 2007). The Fourth Department has rejected the assertion that, where water flows continually onto a property, the tort is continuous in nature and causes of action for nuisance and trespass would not be time-barred even where damage was apparent beyond the statute of limitations. *See EPK Props., LLC v. Pfohl Bros., Landfill Site Steering Comm*., 159 A.D.3d 1567, 1569 (4th Dep't 2018). However, "[c]ourts will apply the continuing wrong doctrine in cases of 'nuisance or continuing trespass where the harm sustained by the complaining party is *not exclusively traced to the day when the original objectionable act was committed." Id*. (citations omitted) (emphasis in original). The continuing wrong rule is "based on the principle that continuous injuries create separate causes of action barred only by the

running of the statute of limitations against each successive trespass" or nuisance. *Capruso v. Village of Kings Point*, 23 N.Y.3d 631, 639 (2014) (citation omitted).

Here, Wright's causes of action accrued, at the latest, in 2010. Wright's witness, Mr. Kendall, testified that the damage to Wright's property was apparent, and it was known to be attributable to water discharges from Copart in 2010. With respect to the sheet flow drainage, Wright may have been on notice of such discharges as early as 2004, when standing water in the area between the two properties and the warehouse building was documented during Wright's purchase of 3 Wright Avenue. In any event, Mr. Kendall testified that Wright "first came to believe that surface water or stormwater draining from the Copart property was causing problems on the Wright property" in 2010.[10] Applying 2010 as the latest date from which the damage became apparent, the statute of limitations expired in 2013. Accordingly, this action is time-barred, having not been commenced until March 2019. *See Alamio v. Town of Rockland*, 302 A.D.2d 842, 844 (3d Dep't 2003) (holding that action was properly dismissed where water damage to property was apparent more than three years prior to the commencement of the action).

Further, Wright is not entitled to use the "continuing wrong" doctrine, as there is one or more specific, objectionable act or acts from which the accrual date is set, and not

---

[10] Wright attempts to create a material question of fact as to when the damages became apparent by citing Mr. Kendall's testimony that the water coming over the embankment was not apparent until 2016 because Copart's perimeter fence obscured the condition. Mr. Kendall's claim of not realizing the source of the water until the later date is belied by his own testimony to the effect that Wright was first aware of water from the Copart property causing damage to the Wright property in 2010 and further, that in 2013, "you could physically see the water running down the hill from Copart and just a constant stream of water." The Court also rejects Wright's argument that the statute of limitation period did not begin to run until 2016 based upon when Mr. Brunea brought the location of the Copart Outlet Pipe to Mr. Kendall's attention. Whether or not the location of the pipe was obscured by weeds does not change the apparent nature of the objectionable water drainage from the eastern embankment and northeast corner of the Copart property, a condition which has existed since 2003. Indeed, the "cause of action accrues when the damages are apparent, not when the damages are discovered." *Naccarato v. Sinnott*, 176 A.D.3d 1467, 1468 (3d Dep't 2019).

from any continuing consequential damages. *See EPK Props.*, 159 A.D.3d at 1569 (finding nuisance and trespass claims to be time-barred because, despite continuing damage, diversion of water from nearby landfill had occurred since implementation of a surface water management plan more than three years prior to commencement of action); *see also Town of Oyster Bay v. Lizza Indus., Inc.*, 22 N.Y.3d 1024, 1032 (2013) ("Although plaintiffs allege that the injuries to their property are ongoing, defendants' tortious conduct consisted of discrete acts … that ceased upon completion of the sewer construction over 20 years ago."). Here, the alleged damages stem from discrete acts, i.e., Copart's installation of a drainage system using catch basins and piping, as well as the paving and laying down of gravel to improve the property, all of which occurred in 2003. Any subsequent consequential damages stemming from these acts do not give rise to successive causes of action. *See Naccarato*, 176 A.D.3d at 1468.

Although Wright asserts that the action is not tied to a single, discrete event, but is instead a continuing wrong which creates separate causes of action and new timelines from each successive trespass, the Court is unconvinced. To support this point, Wright argues that Copart's regular receipt of loads of gravel and stone which are spread on the property represents a continuing wrong because they have raised the elevation of the Copart property. Wright argues that these changes have increased the flow and volume of water onto its own property. However, Wright submits no evidence that these routine loads of gravel have changed the condition of the property or caused the alleged effects on water flow. Although Wright cites to the expert opinion of Mr. Newcomb, Mr. Newcomb does not refer to or link these ongoing maintenance loads of gravel to any changes in water discharge. (*See* Dkt. No. 79-1, Newcomb Report, pgs. 3-4, 7, 11, 13). Mr.

Newcomb's comparisons of the "pre-developed conditions" versus "post-developed conditions" of the Copart property are not pertinent to the effect of ongoing maintenance of the developed property. (*Id*.). Further, Copart offers credible testimony of Mr. Brunea that the gravel deliveries are part of routine maintenance of its existing lot and are used only to fill potholes and level the ground from use of heavy machinery.

Wright also argues that Copart's 2018 work on the drainage swale ("Western Swale") directed more water towards the Copart catch basin closest to Wright property and should be considered an action which renewed the statutory accrual date. Wright contends that the swale was newly created, whereas Copart contends the swale was pre-existing and merely cleaned out or restored at that time. The Court finds that Wright has failed to submit credible evidence to create a genuine issue of fact on this issue. Although Wright relies on a contractor letter providing an estimate to Copart for work to "[d]ig out and create swail [sic] for excess water to drain north to catch basin," the representations of said invoice are inadmissible hearsay evidence which is insufficient to create a triable issue of fact. *See* Fed. R. Civ. P. 56(c)(2); *see also Woods v. Newburgh Enlarged City School Dist*., 288 Fed. Appx. 757, 759 (2nd Cir. 2008) (hearsay evidence cannot raise triable issue of fact). Moreover, the accuracy of this description is directly rebutted by testimony of two witnesses with personal knowledge. That testimony is consistent and clear that the 2018 work entailed cleaning and re-establishing of a pre-existing swale that has existed, along with catch basins and pipes, as part of Copart's drainage system since 2003. The event of this restoration work is insufficient to renew the statute of limitations accrual date or establish a continuing wrong.[11]

---

[11] In the event the District Court agrees with Wright's position that Copart's work on the swale in 2018 creates a triable issue of fact as to the accrual date of the statute of limitations, this Court recommends

For these reasons, the Court recommends that summary judgment be granted to Copart on Wright's nuisance, trespass, and negligence claims.[12] Wright's request for a permanent injunction is moot based on the determination that Wright's substantive claims fail as a matter of law.

### 3. Prescriptive Easement for the Pipe Drainage

Copart moves for summary judgment on its counterclaim seeking a declaratory judgment that it is possessed of an easement by prescription over the subject area of the Wright property for purposes of discharging storm water and other surface water. (Dkt. No. 70-1, pgs. 23-27). The counterclaim also seeks a judgment enjoining Wright from closing, blocking, or obstructing the easement area, along with recovery of actual damages therefrom. (*Id*.).

"[A]n easement for drainage of surface water may be acquired by prescription." *Torre v. Meade*, 226 A.D.2d 447, 447 (2d Dep't 1996); *see also Schoharie v. Coons*, 34 A.D.2d 701 (3d Dep't 1970), *aff'd* 28 N.Y.2d 568 (1971). "An easement by prescription is generally demonstrated by proof of the adverse, open and notorious, continuous, and

---

that the trial inquiry be limited to damages caused by the increased flow of water through the swale following the 2018 work. The swale had the undisputed effect of lessening the sheet flow of water across the western boundary, as it directed stormwater from the western embankment into the drainage system and eventually onto the northwest corner of Wright's property. Wright argues that the work on the swale increased the net flow of water through the drainage system. Assuming Wright can prove it has been damaged by water flow through these artificial means, it should be required to establish what damages are traceable to actions occurring during the statute of limitations period. In other words, Wright must show how the 2018 swale work created damage in excess of that resulting from installation of Copart's drainage system in 2003.

[12] Copart also argues that Wright's trespass, nuisance, and negligence claims premised on the discharge of water onto the Wright property via the Copart Outlet Pipe fail because Copart has acquired a prescriptive easement over certain parts of Wright's property for the discharge of water. It submits that because the drainage has been occurring for a period well over the 10-year period required to establish an easement by prescription bars any reliance on the "continuing wrong" doctrine. *See Vinciguerra v. State*, 262 A.D.2d 743, 745 (3d Dep't 1999) (rejecting claim that continuing trespass existed where discharges at issue had been occurring, in open and notorious fashion, for the prescriptive period). The Court does not reach this affirmative defense, based on its finding, *infra*, that Copart has not met its burden to prove the elements of a prescriptive easement for the Copart drainage pipe.

uninterrupted use of the subject property for the prescriptive period. *Vitiello v. Merwin*, 87 A.D.3d 632, 633 (2d Dep't 2011). The party claiming an easement has the burden of establishing these elements by clear and convincing evidence. *Mandia v. King Lumber & Plywood Co*., 179 A.D.2d 150, 156 (2d Dep't 1992). The prescriptive period under New York law is 10 years. *See* NY CLS RPAPL § 501(2) (citing NY CLS CPLR § 212(a)).

Copart relies on the matter of *Vinciguerra v. State* for a finding that a prescriptive easement may be obtained where a drainage system directs water onto a property. *See* 262 A.D.2d 743, 745 (3d Dep't 1999) There, the claimants purchased a property without knowing that a "concrete head wall and culvert, part of a drainage system for a nearby roadway, encroach[ed] approximately 2 to 2 ½ feet onto claimants' land and direct[ed] water across it." *Id*. at 734. The Court held that the State of New York had acquired a prescriptive easement for the discharge of water because it was "clear that the discharge of water and the construction of the wall and culvert were adverse to the interests of claims and both continuous and uninterrupted…" *Id*., at 745. Further, undisputed testimony revealed that at certain times, including the time when claimants purchased the […] property, the nearby stream was dry, thereby making the head wall and culvert visible upon inspection." *Id*. The Court also found that the testimony showed that when water was running the ditch was inundated with water which was openly visible and the claimants admitted they never thoroughly inspected the ditch or had the property surveyed before their purchase. *Id*.

Here, the Court finds that Copart has failed to demonstrate all the elements needed for an easement by prescription for the Copart Outlet Pipe onto the 1 Wright Avenue parcel. It is undisputed that the pipe was installed in 2003, at which time stormwater began

to discharge through it and onto the northern portion of Wright's property, which has continued to date. Therefore, Copart has shown that the use was continuous for more than 10 years. However, the evidence of record does not support Copart's claim that its use of the underground drainage pipe was open and notorious. *See Courtney v. 18th & 8th LLC*, 145 A.D.3d 471 (1st Dep't 2016) (finding that use of underground sewer pipe was not open and notorious). Although the flow or drainage of water from the northeast corner of the Copart property onto the northwest corner of the Wright property was undisputedly apparent since at least 2010, the visibility of the Copart Outlet Pipe is disputed by Mr. Kendall's testimony that the pipe was obscured or hidden by weeds prior to 2016. The open and notorious nature of the pipe is also brought into question by video evidence depicting the northwest corner of the Wright lot which does not reflect any visible portion of a pipe. Copart argues that Wright itself buried the pipe in 2018, but it has not provided evidence of the pipe's open and notorious nature during the relevant easement period. Summary judgment is properly denied where the moving party has failed to show that their use of an underground pipe was open and notorious for the prescriptive period. *See Masucci v. DeLuca*, 97 A.D.3d 550, 551 (2d Dep't 2012).

Further, a party claiming a prescriptive easement must show what portion of claimant's land was actually used during the prescription period in order to establish its entitlement to prescriptive easement. *See Zutt v. State of New York*, 50 A.D.3d 1133, 1133 (2d Dep't 2008) ("the defendant could acquire an easement only equal in width to that portion of the subject property actually used during the prescriptive period"). Here, Copart has not done so, and in fact, has failed to specify the extent or boundary of its claimed easement.

Additionally, as Copart has not established open and notorious use of the pipe, it is not entitled to a presumption that its use was hostile to the property rights of Wright or the predecessor owner and not permissive in nature. *See J.C. Tarr, Q.P.R.T. v. Delsener*, 19 A.D.3d 548, 550 (2d Dep't 2005) ("Generally, where an easement has been shown by clear and convincing evidence to be open, notorious, continuous, and undisputed, it is presumed that the use was hostile, and the burden shifts to the opponent of the allegedly prescriptive easement to show that the use was permissive.").

Thus, the Court finds that disputed issues of fact exist regarding any prescriptive easement over the Wright property. Accordingly, the Court recommends that Copart's motion for summary judgment on this counterclaim be denied and the claim proceed to trial.

### III.    Motion to Amend

Wright Associates moves to amend its complaint to include additional facts related to Copart's alleged non-compliance with the approved site plan for development of its property and to add an additional cause of action alleging "violation of approved site plan." (Dkt. No. 72). Wright alleges that it has been harmed as a result of Copart's non-compliance with the plan approved by the Village of LeRoy Planning Board, including by the following actions of Copart: (1) creating an impervious gravel and rock surface larger than the approved acreage; (2) grading the surface of the Copart property such that larger than approved acreage drains towards the Wright property; (3) installing two catch basins, connected by an underground pipe, for the purpose of collecting and redirecting excess surface water to the Wright property; (4) installing an underground pipe that discharges surface water runoff collection by said catch basins onto the Wright property; and (5)

creating an additional drainage swale directing excess surface water runoff to the Wright property at an increased rate. Wright argues that Copart's failure to develop its land in compliance with the approved site plan constitutes a violation of LeRoy Zoning Code, regardless of whether the Village has failed to act on that violation thus far.

Wright argues that leave to amend should be granted under Fed. R. Civ. P. 15(a)(2) because the proposed amendments are meritorious, will not result in undue prejudice to defendant, are proposed in good faith, and will not unduly delay the final disposition of this action. Copart opposes this motion based on untimeliness and substance, arguing that the proposed cause of action is futile on its merits. (Dkt. No. 77).[13]

Generally, leave to amend a complaint should be freely given unless there is evidence of undue delay or bad faith, prejudice to the opposing party, or if an amendment would be futile. *See* Fed. R. Civ. P. 15(a)(2) (a court "should freely give leave to amend when justice so requires"); *Foman v. Davis*, 371 U.S. 178, 182 (1962); *Milanese v. Rust-Oleum Corp.*, 244 F.3d 104, 110 (2d Cir. 2001) (leave to file an amended complaint shall be freely given); *see also Document Sec. Systems, Inc. v. Adler Technologies, Inc.*, 03-CV-6044, 2008 U.S. Dist. LEXIS 15744, at *16 (W.D.N.Y. Feb. 29, 2008) ("the purpose of Rule 15(a) is to encourage disposition of litigation on the merits, rather than on procedural technicalities."). "Although the decision of whether to allow plaintiffs to amend

---

[13] Wright submits that although its motion was not filed until September 17, 2021, it has demonstrated "good cause" under Fed. R. Civ. P. 16(b)(4) for the Court to modify its scheduling order (Dkt. No. 54), which required any motions to amend the pleadings be filed prior to October 1, 2020. As to delay and timeliness of the request to amend, Wright submits that its discovery of facts related to the site plan were ongoing and it did not obtain enough evidence of Copart's violations of the approved site plan until conclusion of the exchange of expert reports and deposition testimony in or around December 2020, past the deadline for filing motions to amend. Copart counters that Wright was aware of the essential facts and knew of this legal theory no later than July 2019; yet they waited until nearly a year after the deadline to bring this motion. For the purposes of this Report and Recommendation, the Court assumes but does not hold that Wright's motion was timely and it will proceed to review the proposed amendments on their merits.

their complaint is left to the sound discretion of the district court, there must be good reason to deny the motion." *Acito v. IMCERA Group*, 47 F.3d 47, 55 (2d Cir. 1995). "The nonmovant has the burden of showing that the proposed amendment would be futile." *Zink v. First Niagara Bank, N.A.*, 13-CV-0176, 2014 U.S. Dist. LEXIS 181511, at *4 (W.D.N.Y. Dec. 11, 2014) (quoting *Youngbloods v. BMG Music*, 07-Civ-2394, 2011 U.S. Dist. LEXIS 1585, at *27 (S.D.N.Y. Jan. 6, 2011)). "If a proposed amendment is not clearly futile, then denial of leave to amend is improper." 6 Wright, Miller, Kane, et. al., *Federal Practice & Procedure (Civil)* §1487 (3d ed. 2014).

An amendment to a pleading will be futile if a proposed claim could not withstand a motion to dismiss pursuant to Rule 12(b)(6). *Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*, 282 F. 3d 83, 88 (2d Cir. 2002). To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. (quoting *Twombly*, 550 U.S. at 556). In deciding a Rule 12(b)(6) motion, the Court accepts all factual allegations in the complaint as true, drawing all reasonable inferences in the plaintiff's favor. *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012). When presented with a 12(b)(6) motion, the district court may not consider matters outside of the pleadings. *Courtenay Communs. Corp. v. Hall*, 334 F.3d 210, 213 (2d Cir. 2003).

To support its proposed cause of action for violation of an approved site plan, Wright relies on matter of *Little Joseph Realty, Inc. v. Babylon*, 41 N.Y.2d 738 (1997). Wright also refers to the Village of LeRoy Zoning Code, which makes it unlawful to construct or use any land or structure "not permitted by an approved zoning permit or certificate of occupancy." *See* Village of LeRoy Code §§ 215-16 (A), (C) and (G) (setting out procedure for violations of zoning law and empowering the Village to "maintain[] an action or proceeding in the name of the Village or Zoning Enforcement Officer [...] to compel compliance with or restrain by injunction the violation of any provision" of the Zoning Code).

In *Little Joseph*, the New York Court of Appeals recognized the right of a private property owner to bring an action seeking to enjoin the continuance of a zoning violation and obtain damages. *Id*., at 741-42. Relying on its prior decision in *Marcus v. Village of Mamaroneck*, the Court explained that "[t]he provision that an official of the village shall enforce the zoning ordinance does not prevent a private property owner who suffers special damages from maintaining an action [for redress]." *Id*. (quoting *Marcus*, 283 N.Y. 325, 333 (1940)). It further opined, "when it has been established that a defendant violates a valid zoning ordinance, there is no need for judicial accommodation of the defendant's use to that of the plaintiff. For a court to do so would be for it to usurp the legislative function." *Id*., at 745. Applying this jurisprudence in *Little Joseph*, the Court found it appropriate to enjoin the operation of an asphalt plant in a district in which such a use was prohibited. *Id*. Similarly, in *Marcus*, the Court held that notwithstanding a building permit issued for improvements on a "beach club" in a residential district, the village's zoning ordinance prohibiting such a non-conforming use entitled plaintiffs to bring suit.

Here, Wright asserts that it has a valid claim based on Copart's having developed its property in a manner which substantially deviated from the plans and conditions upon which the municipal planning board granted site approval and a permit. Wright further submits that even though Copart has a facially valid Certificate of Compliance/Occupancy, that fact does not remedy its contravention of zoning laws.

Accepting these allegations as true, Wright has failed to state a plausible cause of action stemming therefrom. Failure to comply with an approved site plan is not a statutory violation and does not represent a violation of legislative action that may convey a private right of action under *Little Joseph*. The proposed amended complaint does not allege that Copart is improperly zoned nor that its presence violates any applicable zoning law. Wright's proposed claim is based on an alleged violation of a site plan and *not* of a zoning ordinance or similar law. The caselaw relied on by Wright relates only to private rights of action based on zoning law violations. None of those holdings extend the private right of action to instances of non-statutory violations.[14] Further, although Wright is correct in asserting that the issuance of an unlawful permit cannot confer rights in contravention of zoning laws, Wright has not plausibly alleged that the permit for the Copart property was issued in violation of the Village Zoning ordinances. *See Buffalo v. Roadway Transfer Co.*, 303 N.Y. 453, 463 (1952) (citing *Marcus*, 283 N.Y. at 330).

The Court does not find it necessary to reach the questions of whether Wright has shown standing to maintain a cause of action, *see Allen Avionics, Inc. v. Universal*

---

[14] Wright cites *Beaudin v. Town of Alexandria Planning Bd.*, 233 A.D.2d 855 (4th Dep't 1996), for an instance when violation of the conditions of a site plan approval could have made a defendant subject to suit, had the petitioner demonstrated standing. However, the limited analysis offered on the relevant point does not clarify to this Court whether the Appellate Court would have approved an action maintained only on violations of the conditions of a site plan, as opposed to one based on the wrongful issuance of a zoning variance and related site plan approval. As such, the Court is not persuaded by this argument.

*Broadcasting Corp.*, 118 A.D.2d 527 (2d Dep't 1986) (holding that in order to maintain a private action to enjoin a zoning violation, plaintiffs must establish that they have standing to do so by demonstrating that they have sustained special damages by virtue of defendants' activities), or whether such an action would be time-barred, *see Marcus*, 283 N.Y. at 331 (explaining that absent prejudicial laches that led a defendant to develop its property in violation of a zoning ordinance, lapse of time alone does not bar a remedy for such a violation).

For these reasons, the Court recommends that Wright's motion to amend be denied.

## CONCLUSION

For the foregoing reasons, it is recommended that Defendant's motion for summary judgment (Dkt. No. 70) be granted in part and denied in part. More specifically, it is recommended that judgment be entered in Defendant's favor on each of Plaintiff's claims. It is recommended that Defendant's motion for summary judgment on its counterclaim for a prescriptive easement be denied, and that the claim proceed to trial. It is further recommended that Wright's motion to amend its complaint (Dkt. No. 72) be denied. Lastly, based on the recommended dismissal of each of Plaintiff's claims, it is further recommended that Defendant's third-party complaint be dismissed in its entirety.

Pursuant to 28 U.S.C. §636(b)(1), it is hereby **ORDERED** that this Report and Recommendation be filed with the Clerk of Court.

Unless otherwise ordered by Judge Skretny, any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a),

and 6(d) of the Federal Rules of Civil Procedure, and W.D.N.Y. L. R. Civ. P. 72.  Any requests for an extension of this deadline must be made to Judge Skretny.  **Failure to file objections, or to request an extension of time to file objections, within fourteen days of service of this Report and Recommendation WAIVES THE RIGHT TO APPEAL THE DISTRICT COURT'S ORDER.**  *See Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989).

The District Court will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not, presented to the Magistrate Judge in the first instance. *See Paterson–Leitch Co. v. Mass. Mun. Wholesale Elec. Co., 840 F.2d 985, 990-91 (1st Cir. 1988).*

*Finally, the parties are reminded that, pursuant to W.D.N.Y. L.R. Civ. P. 72(b), written objections "shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection, and shall be supported by legal authority."*  **Failure to comply with these provisions may result in the District Court's refusal to consider the objection.**

        **SO ORDERED.**

DATED:        September 13, 2022
              Buffalo, New York


                        /s/ Michael J. Roemer
                        MICHAEL J. ROEMER
                        United States Magistrate Judge